## Attachment 5

### Statement of Claim - Facts Underlying Claims

1.    The plaintiff is a doctoral candidate with two master's degrees and a baccalaureate degree.[1]

2.    Plaintiff has studied under US military and intelligence community personnel and had intended to work for the U.S. Government subsequent to the completion of his Ph.D.[2]

3.    The plaintiff has never worked for the U.S. government as an employee or contractor.

4.    The plaintiff maintains that for unknown reasons[3] he was wrongly labeled a "domestic threat" and "terrorist," and has been extra-judicially targeted by the defendants for "disruption"[4] and harassment.

5.    The plaintiff has never engaged in any behavior, nor ever been involved in any activities that could be construed or even misconstrued as a threat

---

[1] The plaintiff is defending his dissertation in Spring 2017. His post-graduate research includes Chinese military and industrial activities, Sub-Saharan geopolitics and Salafism in Africa, while his mid-1990s baccalaureate research focused on Middle Eastern Studies and Islamist extremism.

[2] Plaintiff's security analyses have been submitted by plaintiff's professors to SOUTHCOM, ICE and at least one U.S. intelligence agency.

[3] Plaintiff believes that his educational focus is the primary reason he has been unfairly targeted, harassed and stalked.

[4] While there are not many public references to the FBI's classified "disruption" program, often run in coordination with other agencies and sub-contractors, its existence is acknowledged in DOJ documents. According to the *Audit of the Federal Bureau of Investigation Annual Financial Statements* (2015) "The FBI .... [now] a proactive agency .... focuses [its] resources on targeting and disrupting terrorist threats" through CT (Counter-Terrorism) investigations "managed at (FBI) Headquarters by the Counterterrorism Division (CTD)." p. 8. The American Civil Liberties Union noted, "The FBI is [now] ... unfairly targeting [people] for surveillance ... and disruption strategies." American Civil Liberties Union, *Unleashed and Unaccountable: The FBI's Unchecked Abuse of Authority*, 2013, p. i.

to the United States, nor has the plaintiff ever engaged in any conversations with third parties, which could be interpreted as such.

6.    The plaintiff was never afforded due process,

7.    The plaintiff has been and continues to be targeted, stalked and harassed by the defendants, as subsequently described within this attachment.

8.    The targeting and harassment includes, but is not solely limited to constitutional rights and federal law violations as outlined within Attachment 3.

9.    Since the plaintiff believes he has sufficient cause for civil litigation under the Federal Torts Claim Act (FTCA) and through Bivens Actions, he has included information in this request for relief, which will satisfy anticipated future federal protocol requirements,[5] while also serving as a statement of claim for the pending litigation.

### Synopsis of Defendant Involvement

10.    The plaintiff is the victim of stalking, harassment and illegal disruption operations, perpetuated by the Federal Bureau of Investigation (FBI), Department of Homeland Security (DHS), National Security Agency (NSA) and Virginia-based Data Fusion Centers.

11.    In the plaintiff's case, the defendants have been assisted by InfraGard, Law Enforcement Intelligence Units (LEIUs), and members of the private sector.

---

[5] The plaintiff intends to file the Standard Form 95 (SF95) with the defendant agencies in the near future per uniform procedure as described within the FTCA.

12.     Attachment 5A outlines how the defendants have worked in coordination with proxies, non-governmental entities, contractors and hirees, which operate with impunity, outside the boundary of the law.[6]

13.     The defendants have engaged in a systemic pattern of unconstitutional behavior towards the plaintiff for more than a decade and demonstrated intentional disregard for his constitutional rights.

14.     While he lived abroad, foreigners in several different countries relayed to the plaintiff that individuals working with the U.S. government told them the plaintiff "was being investigated by the FBI" and was a "terrorist."[7]

15.     In 2003, the FBI identified the plaintiff as a possible "Taliban" or "al Qaeda" contact to foreign authorities, in the country of the plaintiff's residence at that time.

16.     The defendants' misrepresentation to the foreign government led to the plaintiff being set up, arrested and then placed in proxy detention in 2004.

17.     The judge issued a writ of habeas corpus, held a hearing in which he found the plaintiff had been unlawfully detained, and demanded the plaintiff's immediate release.

---

[6] In order to fully comprehend this attachment (Attachment 5: Statement of Claim - Facts Underlying Claims), which describes some rather complex and opaque dynamics, it is important to first peruse Attachment 5A: Defendant Description and Interrelationships.

[7] The plaintiff originally attributed the comments to anti-American sentiment and xenophobia, however given the prolific occurrence of similar incidents subsequent to his return to the United States in 2013; the plaintiff realized that many issues he had experienced abroad had been machinated by the defendants.

18.    The plaintiff's attorney, already working in conjunction with the defendants, absconded with the plaintiff's release order and the plaintiff was then illegally imprisoned a second time for a total of 33 days.[8]

19.    The defendants subsequently interfered with plaintiff's attempts to retain legal counsel,[9] even as he was detained in solitary confinement in medieval conditions[10] in a maximum-security prison.[11]

20.    The plaintiff maintains that since his return to the United States in 2004, both the NSA and state-managed, DHS-funded Regional Data Fusion Centers, have relayed his personal information, personally identifiable information (PII), disinformation, and the plaintiff's location[12] to federal, state and local law

---

[8] The FBI hastens to question Americans who have been arrested for terrorism abroad. Despite the fact that the US embassy was aware of the plaintiff's illegal incarceration as an "al Qaeda" or "Taliban" affiliate - in South America, the FBI remained ostensibly absent and never once made an effort to interview the plaintiff while he was incarcerated. The plaintiff made one phone call out to his father from the prison. However, the plaintiff's father, at the behest of the defendants, did not tell the plaintiff's family that the plaintiff was being illegally detained in solitary confinement.

[9] The plaintiff has observed that in his case, FBI entrapment operations at home and abroad have always been followed by the covert prevention and denial of his attempts to retain legal counsel.

[10] The plaintiff was held in an unlit and windowless, 6' x 8' concrete cubicle, with two breathing holes, each about three inches in diameter, with no running water. The dungeon-like conditions of the solitary confinement cells subsequently sparked a human rights investigation and they were immediately banned from use in the facility.

[11] While the plaintiff was incarcerated, there was a riot in which the prisoners burned down half of the facility. As national papers noted, it took several anti-riot teams to quell violence in which gunfire was exchanged and more than six lives were claimed.

[12] This includes, but is not limited to, technology and intelligence gathering systems such as the NSA's measurement and signature intelligence (MASINT) apparatus, wide area persistent surveillance (WAPS), vehicle-mounted GPS and burst transmitters. The plaintiff confirmed this information in 2016 through a retired NSA technical director. Information on these systems is also available in open sources.

enforcement personnel, and citizen hirees, for the purpose of stalking, harassment and disruption.

21.    The plaintiff has also become aware that the NSA, possibly in conjunction with DHS-funded fusion centers, enabled the real-time access to all of the plaintiff's internet[13] and telephonic[14] communications by the other defendants and those in their employ.

22.    The plaintiff has discovered that the defendants, working in collusion for more than a decade, intercepted the plaintiff's communications, impersonated him on-line, and utilized his family history, private information, medical records, and transactional information, in order to disrupt his finances and career, destroy his reputation, and to deny him his constitutional rights.

23.    The defendants have approached all of the plaintiff's family members and contacts, used disinformation to discredit the plaintiff, and then exploited the division between the plaintiff and his familiars, which the defendants themselves created and cultivated.

---

[13] As referenced in Attachment 5A (Footnote 6), former FBI Director Mueller indicated in testimony before a Senate Judiciary Oversight Committee hearing in March 2011, that the FBI had real-time access to Americans' internet activities through an agreement with the NSA. Furthermore, law enforcement agencies are now running remote surveillance software suites such as FinFisher, or those designed by Hacking Team. These software suites allow federal personnel to warrantlessly mount cyber-operations that only the NSA was capable of several years ago.

[14] All of the listed defendants, including the Virginia State Police and the Fairfax County Police Department utilize similar cell "site-simulator" technology, referred to as Dirt Box, Triggerfish, StingRay, HailStorm, KingFish or Amberjack. According to the 2010 user's manual, the "StingRay" device, which is manufactured by the Harris Corporation, allows for real-time tracking of subjects and audio monitoring of cellphone conversations, as do several other hand-held devices.

## Activities Summary

24.      The plaintiff has been subject to pervasive identity theft, on-line impersonation, anti-Semitic communications, theft of research, and thousands of hacking and cyber-harassment incidents.

25.      The plaintiff has been the victim of warrantless entries[15] and tortious interference with most of his negotiations, resulting in the loss of hundreds of thousands of dollars of real and personal property.

26.      The plaintiff's communications via United States Postal Service (USPS) have been subject to theft and vandalism.[16]

27.      The defendants have interfered with the plaintiff's ability to freely worship.

28.      The defendants have harassed, coerced and intimidated the plaintiff's professional contacts with the goal of interfering with his career and ability to generate a revenue.

29.      In what can be likened to a modern form of tar and feathering, the defendants have made a concerted effort to regularly target the plaintiff with false accusations of homosexuality and crimes of moral turpitude, through what equates

---

[15] There has never been any sign of entry and in most instances; personal property has been stolen during the "sneak and peek" operations. The defendants met with the plaintiff's U.S. landlord in late 2011, while the plaintiff was in Africa. Using keys obtained from the plaintiff's landlord, the defendants entered the plaintiff's residence between November 5 and November 9, 2011. Several thousand dollars' worth of property was stolen during the illegal entry.

[16] These incidents occurred from October 2013 to mid-2015. The plaintiff filed two complaints with USPS Office of the Inspector General in the first half of 2015.

to a weaponized slander campaign, designed to destroy the plaintiff's reputation, and social and professional networks.

30.    This targeting began in earnest in 2009, after the plaintiff moved abroad and continued when he returned to the United States in 2013.

31.    All of the accusations have similar narratives: the plaintiff is a "potential Muslim convert, a terrorist, a threat to the community, and is involved in crimes of moral turpitude."[17]

32.    The defendants have employed slander as a means of isolating the plaintiff from his family, social contacts and academic peers while simultaneously inciting members of the public to engage in violence against the plaintiff.

33. As a result of these actions, the plaintiff has been subject to assault, death threats and hate crimes.

34.    In many instance, the individuals perpetrating these acts have let the plaintiff know, in no uncertain terms, that they have knowledge of the plaintiff's personal life, daily routine, and personal information, such as where the plaintiff lives, at which locations he drinks coffee, the grocery stores he frequents, where he works out and at what time.

35.    Immediately subsequent to filing complaints with the defendants in 2016, the plaintiff was subject to a death threats, vehicle vandalism, stalking and harassment in public locations, in some cases by armed citizens, permanent resident aliens, and foreign nationals.

---

[17] Some of the false accusations targeting the plaintiff are so profane and morally reprehensible, it is not appropriate to include them within this petition.

36.    The defendants have interfered with the plaintiff's ability to retain legal counsel, and have contacted and coerced several of his attorneys.

37.    The subsequent sub-sections serve to further detail the afore-referenced activities of the defendants.

## Cyber-Harassment Summary

38.    Since there have been so many incidents of cyber-harassment, the plaintiff has included Attachment 5B, which outlines the different types of online incidents the plaintiff has to endure on a daily basis. The plaintiff does not have one online account, which has not been targeted.

39.    The plaintiff noted a marked increase in cyber-harassment beginning in 2012 and 2013, while he was living abroad, however the incidents further intensified and became all-pervading in the fall of 2013, subsequent to the plaintiff's return to the United States.

40.    The plaintiff has been subject to identity theft, impersonation, death threat e-mails, hacking and manipulation of his PayPal, eBay, bank accounts, email accounts, university accounts, and accounts related to his health and auto insurance.[18]

---

[18] The plaintiff's bank's network was hacked into between March 2 to March 4, 2016, and the plaintiff's PIN code changed on his sole debit card, rendering the card inoperable. The bank issued the plaintiff a new card on March 5, 2016. In the first week of December 2016, the plaintiff's PIN code was once again altered, limiting the plaintiff's access to his debit card. The bank issued plaintiff a new card on December 9, 2016.

## False Profile Creation with Foreign Governments

41.    In the plaintiff's case, the defendants and in particular the FBI, have been responsible for the genesis and "sequential snowballing" of disinformation among foreign governments.[19]

42.    Beginning in the second half of 2009, the FBI relayed the bogus profile they had created for the plaintiff to the security apparatus of every country he passed through in East Africa, making sure that another layer of disinformation was added in each country.

43.    FBI personnel acted as liaisons between the foreign countries the plaintiff frequented, in order to facilitate the disinformation exchange between those countries.

44.    These actions resulted in the plaintiff's becoming flagged on the databases of foreign governments.

45.    This was once again done with the intention of causing the plaintiff harm or triggering proxy detention in a foreign country.[20]

46.    The FBI then subsequently created references to the plaintiff's inclusion on the databases of foreign security apparatus on US databases, including

---

[19] As previously referenced, this began in 2003 and led to the plaintiff's false arrest and illegal proxy detention in 2004.

[20] The disinformation disseminated by the defendants to foreign governments once again puts the plaintiff at risk of proxy detention, injury and death. The plaintiff believes these actions are in contravention to 18 U.S. Code § 956, "Conspiracy to to kill, kidnap, maim or injure persons ... in a foreign country."

those integrated with the U.S. State Department[21] and DHS-funded, Fusion Center databases.

47.     When the plaintiff returned to the US in October 2013, unbeknownst to the plaintiff, his profile on security-related databases in five countries had been 'laundered' and reconstructed, based on the disinformation created and continuously recirculated by the defendants while the plaintiff was residing outside of the United States.[22]

48.     Commencing in the first week of September 2015, the defendants approached the plaintiff's neighbors[23] in Springfield, Virginia, and disseminated the FBI's disinformation package, combined with the plaintiff's personal information,[24] and warnings that the plaintiff posed a "threat to the neighborhood and community."

---

[21] In 2013, U.S. embassy personnel inadvertently relayed some of the disinformation fed to Department of State databases by the FBI.

[22] In the plaintiff's case, the FBI went beyond the boundaries of what is referred to as "parallel construction." Since the plaintiff was not engaged in any illegal activities, the FBI disseminated a false criminal background to foreign governments, in order to trigger foreign investigations of the plaintiff, upon which further US-based disruption operations and "investigations" could be prefaced. Thus, the parallel construction, rather than being based on real criminal activity, was in actuality based on crimes, which were never committed by the plaintiff.

[23] The plaintiff can identify most of the neighbors contacted by the defendants, in addition to identifying the specific personal information and disinformation relayed to each individual, and the cases in which these individuals were compensated by the FBI as paid informants.

[24] The plaintiff was approached by neighbors who openly addressed the plaintiff's estrangement from his family, his academic research, his medical history, his 1990 conviction for possession of a small amount of cannabis, and the statement that the plaintiff was "chased out of South Florida by law enforcement."

## Online Identity Theft and Impersonation

49.    The defendants created a false online profile for the plaintiff and essentially hijacked the plaintiff's identity.

50.    The defendants opened on-line social networking accounts in the plaintiff' name, posted information which referenced his education and time abroad in order to make the accounts appear bona fide, then verified those accounts through hacked e-mail addresses belonging to the plaintiff.

51.    Specific places the plaintiff frequented while in East Africa and aspects of his research were integrated into the bogus profiles in order to make the profiles appear genuine.

52.    The defendants uploaded images in the plaintiff's likeness,[25] uploaded pornographic pictures to the accounts, and then linked those bogus accounts to accounts of children who were using social networking platforms.

53.    The bogus accounts were then inter-linked to each other, in order to give them more credibility.

54.    The YouTube account opened in the plaintiff's name indicated the plaintiff's favorite videos were related to infants learning to crawl, children's games, military subjects, guns and bank robberies, indicating a disturbing combination of interests, especially when viewed together with the other accounts created in the plaintiff's name.

---

[25] Images were professionally modified to the extent that if an individual had only met the plaintiff several times, or knew the plaintiff, yet had not seen him in several years, he or she would identify the plaintiff as being the subject in the images.

55.    The account creators also linked those accounts to several of his familiars in order to make the accounts seem more realistic to plaintiff's family and friends. These additional embellishments conveyed an even greater indication that the plaintiff was the creator of those accounts.

56.    The fabricated criminal profile created by the defendants for the plaintiff was subsequently proliferated among the plaintiff's family, friends, and diplomatic contacts in the U.S. and abroad by the defendants, in addition to foreign governments.

57.    The disinformation propagated by the defendants to the plaintiff's contacts, perfectly coincided with the on-line profile the defendants had created in the plaintiff's name, unbeknownst to the plaintiff.[26]

58.    This was done after the plaintiff's return to the United States in late 2013, in order to impede the plaintiff's movement, and make it difficult for him to travel or work in the geopolitical regions pertinent to his research.

59.    As of the date of filing, the plaintiff is still receiving text messages on his phone and e-mails referencing new bogus online accounts opened in his name.[27]

---

[26] The plaintiff's family, friends, professors, and contacts on two continents were told that plaintiff was "trolling" for minors online, and that the plaintiff had been involved in "crimes of moral turpitude" with children. The online accounts were then used as substantiation the plaintiff was engaged in such activities. Once again, some of the details and statements made by the defendants to the plaintiff's contacts are so disturbing the plaintiff has elected not to insert them into this request for relief.

[27] The e-mails and text messages sent to the plaintiff have contained a high level of personal and confidential data and have been transmitted to the plaintiff for the sole purpose of inducing additional emotional distress.

60.    In 2015, within 24 hours of the plaintiff complaining to the Florida Department of Law Enforcement (FDLE), which administers the Southeast Florida Fusion Center (SEFFC), the accounts were taken down.[28]

61.    Accounts were once again created in the plaintiff's name in late 2015 and 2016.

### Religious Discrimination, anti-Semitism and Hate Crimes

62.    The plaintiff, who is of Judeo-Christian descent, has been subject to anti-Semitic e-mails, hate crimes, and interference with his communications with a Jewish organization based in the United States and Israel.

63.  In early 2016, the plaintiff began the "right-of-return" process offered to individuals of Jewish ancestry through an Israeli organization.

64.    The plaintiff's on-line account with that organization was hacked, and uploads of his personal information[29] were deleted.

65.    Subsequently, someone impersonating the plaintiff began calling his contact person at that organization and leaving messages in the plaintiff's name in order to create issues for the plaintiff and to hinder his application process.

66.    Even though the plaintiff has never been in a mosque in his life, does not speak Arabic, wears western clothing, is clean-shaven, and does not appear to

---

[28] The plaintiff was told by the FDLE investigator that since there was the "belief that law enforcement personnel were responsible for the creation of the bogus accounts, that they would not investigate." He did not specify whether he was referring to the plaintiff's "belief" or FDLE's "belief." The plaintiff received a letter from FDLE, dated two days after that conversation, which stated an FDLE investigation found no evidence of any of the accounts, which the plaintiff had referenced in his complaints to the department.

[29] The deleted materials included photographs, documents and a copy of plaintiff's birth certificate.

fit the profile of a Muslim in any respect, he has been approached in different locations and told that "terrorists belong in Nigeria, Afghanistan and Somalia," and that he should "go back where he belongs," despite the fact the plaintiff is an American-born citizen.

67.     In some instances, these aggressions have been combined with comments that the plaintiff is a "Muslim homosexual" engaged in crimes of moral turpitude.

68.     As of the date of filing of this request for relief, the plaintiff is still subject to these abuses several times a month.

69.     Subsequent to his move from South Florida to North Virginia in late 2015, the plaintiff was approached by neighbors and asked what "god he believes in."

70.     Within one week of arriving in North Virginia, the plaintiff began to regularly find pamphlets and advertising circulars in Arabic left underneath his vehicle's windshield wiper in his neighborhood and at commercial locations.[30]

71.     In 2016, one of the plaintiff's (non-Muslim) neighbors purchased Muslim food from a Muslim market, and brought it to the plaintiff explaining that it was a "gift for the plaintiff for the Muslim holiday."

---

[30] Plaintiff noted that his vehicle was being singled out; no other vehicles in the neighborhood or in the commercial locations ever had similar pamphlets.

## Real Time Cyber-Harassment

72.    Plaintiff is subject to real-time telephonic-[31] and cyber-harassment.[32]

73.    Plaintiff maintains the defendants are not simply passively monitoring his communications, but using them for active harassment and disruption, which includes a wide range of constitutional rights violations as described within this petition.

74.    Phone conversations with an Israeli friend referencing the holocaust were simultaneously matched in real time, by in-bound e-mails to the plaintiff's e-mail address, while he was still engaged on the phone with his friend, referring to the plaintiff as "Hitlerite."[33]

75.    In early 2016, the plaintiff was on the phone reporting civil rights violations and harassment to DHS and stated to the DHS officer taking the complaint that FBI and DHS personnel had accused the plaintiff of being a "terrorist" and having "connections to Afghanistan and Somalia."

76.    Plaintiff stated to the DHS agent that he had never had contacts, e-mails or phone calls with anyone living in those regions.

77.    Within two minutes of making that statement to the DHS attendant, while still on the phone, the plaintiff began to receive inbound calls from numbers preceded by what he later discovered to be the country code for Afghanistan.

---

[31] As referenced in Footnote 14.

[32] Remote System Monitoring Software Suites were referenced in Footnote 13.

[33] This incident occurred on January 12, 2016.

78.     The security department of the plaintiff's cellphone service provider later stated that it looked like the plaintiff's phone bill had been modified on their system to show that the plaintiff was engaged in a 45-minute conversation with Afghanistan, at exactly the same time he was speaking with DHS.

79. The calls from Afghanistan continued for several months as did a surge of e-mails in Arabic despite the fact that prior to that conversation with DHS; the plaintiff had never had any such contacts.[34]

### Theft and Modification of Academic Research

80.     In late 2013, the plaintiff e-mailed an extensive analysis on Salafism and Somali extremism in African nations to one of his professors.

81.     The plaintiff's research was intercepted by the defendants and then relayed, at least in part, to one of the foreign countries that was the subject of the analysis.

82.     The FBI then presented the plaintiff's expertise in that area as another reason to flag him on databases in the United States and several countries in East Africa.

83.     In November of 2015, the plaintiff submitted a portion of his doctoral dissertation to his university professors for review. In an effort to interfere with the plaintiff's academic program, the defendants hacked into a secure, faculty-only,

---

[34] During this period, the plaintiff began to receive calls from unknown numbers in both Maryland and Virginia. Voice messages were left in languages unfamiliar to the plaintiff. Reverse number searches on the internet revealed that all of the callers had surnames of Afghan origin.

university computer network, and modified the plaintiff's research in order to create issues between the plaintiff and his dissertation team.[35]

## Law Enforcement Interaction with Plaintiff

84.     In 2015, the plaintiff was repetitively followed in South Florida by an individual who identified himself as working for DHS. When the plaintiff attempted to file a complaint with the police, he was warned to "be careful" because the "DHS agent was armed."

85.     In both Florida and Virginia, the plaintiff has gone into commercial locations to eat or shop, and return to his vehicle to discover it surrounded by law enforcement vehicles. The marked federal vehicles have frequently been emblazoned with the DHS insignia.

86. The plaintiff has also been followed by the same uniformed officers in unmarked vehicles on different days in different locations in Fairfax County. The vehicles appear to be driven by either the Virginia State Police or Fairfax County Police officers.[36]

87.     In June of 2016, the plaintiff was aggressively stalked through a grocery store by a team of at least four people, at least one of whom was wearing clothing identifying himself as a sheriff's deputy from an adjacent county.[37]

---

[35] In total, an additional 10 pages of extraneous gibberish was inserted into the plaintiff's 18-page submission, rendering his work sub-standard and unacceptable.

[36] Plaintiff has recorded the dates, times, location and license plate numbers of the vehicles involved.

[37] The plaintiff captured portions of the incident on video utilizing a small body camera. The individual was wearing a baseball cap and sport-styled polo shirt with an insignia identifying him as a Loudon County law enforcement officer. Plaintiff believes that this group of individuals may have been at least partially comprised of Law Enforcement Intelligence Unit personnel.

88.    The uniformed individual approached the plaintiff in a confrontational manner and entered his personal space at least five times, in actions, which have recently been described in the media as "bird-dogging."[38]

89.    The plaintiff's landlord in Virginia has twice stated to the plaintiff that unmarked police cars were driving back and forth in front of the plaintiff's residence and parking in close proximity to where the plaintiff parks his vehicle.

90.    In some instances, unmarked cars, usually containing two or more individuals have followed the plaintiff from his home to a store or from public locations to his residence.

### Entrapment Operations and Informants

91.    The plaintiff maintains that in 2010 the NSA, operating from one of its foreign posts within a US government facility, intercepted his communications and relayed those communications to the FBI, which in turn redistributed the content to InfraGard personnel working abroad, in addition to foreign nationals.[39]

92. In one instance, the FBI discovered the plaintiff had been attempting to rent a car, and then arranged for the plaintiff to rent a stolen car, unbeknownst to the plaintiff.[40]

---

[38] Bird-dogging: Aggressive approach, encirclement and jostling of an individual in a public location, done in a coordinated fashion, with the purpose of instilling fear and duress in the subject, and/or the elicitation of a violent response.

[39] The FBI may have also distributed that information to private contractors and sub-contractors.

[40] The fact that the plaintiff had no knowledge of the theft of the vehicle and was in possession of what he thought to be a valid contract precluded the owner from taking any legal action against the plaintiff. However, the plaintiff was almost arrested before the situation could be resolved.

93.     Subsequent to the plaintiff's return in Fall 2013 from living abroad, he he has been approached dozens of times[41] by different individuals attempting to either set him up or coerce him into engaging in criminal activities.[42]

94.     The plaintiff is now subject to a weekly parade of FBI informants comprised of convicts, drug addicts, and criminals attempting to sell stolen items, contraband and narcotics to the plaintiff.

95.     In Fall 2013, the plaintiff's landlord, who claimed he "worked for the US government" and had "security clearance," broke into the plaintiff's rental unit and assaulted the plaintiff.[43]

96.     In the second half of 2014, one of the plaintiff's contacts stated to the plaintiff that he was a "contractor" working for the federal government and that he had "signed off" and gotten "security clearance."[44]

97.     The plaintiff's contact appeared to be referencing a non-disclosure agreement (NDA).

---

[41] The plaintiff is not using the expression "dozens of times" in a casual manner. He has maintained a detailed list and description of many of the incidents.

[42] This includes, but is not limited to, being solicited to buy marijuana, to procure and resell controlled substances to someone, to both buy and sell weapons on the street, to buy stolen property, and to buy alcohol for minors. The plaintiff occasionally goes out to family-owned establishments in clean, middle class neighborhoods, not areas where one might expect such criminal activities to be commonplace.

[43] The Miami Dade Police Department responded to the incident and within several weeks, the plaintiff vacated the rental property, and filed a civil suit against the property owner in Miami Dade County Civil Court. The defendant was ordered to compensate the plaintiff for damages.

[44] This individual had also been apprised of the plaintiff's PII and went into details about the plaintiff's personal and familial history, to which he was never privy.

98.    Without any precedent, plaintiff's contact subsequently became aggressive, began to use anti-Semitic language towards the plaintiff and accused him of "coming back from Africa a homosexual." He then stated to the plaintiff "that a lot of people in the government would be happy to see the plaintiff dead."[45]

99.    In the first half of October 2014, the plaintiff went to meet a doctoral student from East Africa to discuss regional politics, yet instead, during what soon became apparent to the plaintiff to be an FBI entrapment operation, the individual asked the plaintiff to procure weapons and drugs for him. This occurred on two other occasions[46] in the United States and several times in Africa.[47]

100.    When the plaintiff refused to engage in such activities, the student became more insistent and aggressive towards the plaintiff, insisting the plaintiff do this "personal favor" for him.

101.    Even though the plaintiff refused to meet the student for coffee after the illegal requests, the informant continued to call the plaintiff demanding that he help him buy a weapon and drugs.

---

[45] On four occasions in Africa, in two different countries, the plaintiff was told that "people working out of the embassy" had made it known that if anything "happened" to the plaintiff, that no-one at the embassy would care; the plaintiff was considered "persona non-grata" at his own embassies, and indicated that the FBI was involved in targeting the plaintiff in those countries.

[46] The topic of the first South Florida meeting quickly went from the plaintiff asking his contact about the likelihood of conflict in certain regions of Africa in the future, to the plaintiff's contact responding, "Can you get me a gun and some drugs?" This was only the second or third time the plaintiff had met the student over the course of one year.

[47] Within six weeks of the plaintiff's arrival in Africa for research in 2009, the FBI - in conjunction with a foreign government, began to run entrapment operations targeting the plaintiff, in a rather bizarre plot consisting of criminal acts, which the plaintiff had never even expressed a predisposition to engage in - especially in such a dangerous area of the world.

102.   While in South Florida in 2015, a family member of the plaintiff's landlord indicated to the plaintiff that the landlord's family was being compensated by either or both DHS and FBI, to "monitor" the plaintiff.[48]

103.   Each time the defendant has refused to involve himself with an informant, the entrapment operations run by the FBI and the other defendants have subsequently became more frequent, aggressive and Rube Goldbergesque in nature.

104.   In the plaintiff's perspective, the FBI and DHS also appear to have also used these entrapment operations to "validate" to store owners and employees of local businesses that the plaintiff is a "threat to the community" and "under investigation."

105.   The plaintiff was asked by minors in liquor stores to purchase alcohol more than six times in Miami in 2014, sometimes in full view and with obvious knowledge of the employees of the establishments.[49]

---

[48] In some cases, the plaintiff's contacts have even alluded to the type of compensation they have received for acting as informants or agents provocateurs for the defendants. In the situation referenced in Footnote 46, it appears the FBI may have offered to assist the non-citizen informant with a domestic violence proceeding as compensation.

[49] The plaintiff had never been approached in this fashion, in his entire life, until his return to the United States in 2013. These entrapment operations have been mounted despite the fact the plaintiff has never displayed any predisposition to engage in such criminal acts. The plaintiff believes that there is a possibility that US law enforcement may now, in part, be using the bogus profile the FBI created for the plaintiff as "substantiation" the plaintiff had previously shown "predisposition" to commit such crimes.

106.   On numerous occasions, the defendants have asked employees at the commercial locations the plaintiff patronizes, to participate in operations targeting the plaintiff.[50]

107.   During the second half of 2016, the defendants coached an 18-year-old attendant, who worked at a commercial location the plaintiff frequents, to offer the plaintiff sex and drugs if he would "take her out drinking."[51]

108.   The plaintiff estimates that in at least 80% of the entrapment attempts, the defendants have used permanent resident aliens working or frequenting the commercial locations the plaintiff patronizes, to assist them with their endeavors in engaging with and "baiting" the plaintiff.

109.   On the afternoon of January 17, 2015, while the plaintiff was shopping for groceries, he was approached by the manager of a local grocery store in South Florida, shown a picture of an assault weapon on an iPhone, and told that because he (the manager) needed the money, he would sell it "really cheap" to the plaintiff.[52]

---

[50] In Springfield and Falls Church, Virginia, the plaintiff can identify the businesses, which the defendants have visited for the purpose of entrapment operations, in some cases with the cooperation of the owners and employees of those businesses.

[51] The plaintiff later discovered that this individual has a history of drug use, impaired driving, assault and battery. Subsequent to the plaintiff's refusals, the employee became aggressive, verbally abusive, and threatened to assault the plaintiff before her employment was terminated at that location.

[52] When the plaintiff responded to the manager that he was not interested in buying an assault weapon, the manager tried to get the plaintiff to "at least come look at it." The manager became more insistent and belligerent when the plaintiff refused, and attempted on several other occasions to convince the plaintiff to buy the weapon. Note: The individual attempted to sell the gun to the plaintiff for pennies on the dollar.

110.    The plaintiff has not owned any firearms for more than a decade and had not expressed interest in buying a firearm to anyone, especially a military-grade assault weapon in the parking lot of a grocery store.[53]

111.    This incident occurred during the same period the plaintiff was followed around South Florida by armed federal personnel, and was dealing with issues resulting from the bogus online accounts, of which he had just become aware.

112.    Since September 2015, the plaintiff has been subject to unknown individuals approaching him in different locations in Fairfax County and offering to sell him drugs.[54]

113. This has in part coincided with text messages to the plaintiff's cell phone from an unknown party, attempting to interact with the plaintiff, for the purpose of inducing him to purchase narcotics.[55]

### Foreign Entrapment Operations

114.    In the first half of 2014, more than six months after the plaintiff arrived back in the United States, he discovered the FBI had engaged the help of a foreign government to change the documentation of an ex-girlfriend in Africa from 23 or 24 years of age to the age of a minor.

---

[53] While the plaintiff knew the manager well enough to exchange pleasantries, no prior conversations between the plaintiff and the manager predicated such an offer.

[54] In 2016, the plaintiff was approached and offered drugs three times at the same family-run supermarket in Springfield, Virginia. In Fall 2016, the plaintiff exited a supermarket in Springfield, to discover someone leaning against his (the plaintiff's) car, openly and nonchalantly selling drugs in an area with a high level of pedestrian and vehicular traffic.

[55] This incident occurred on March 4, 2016 at 3:15 AM. The plaintiff noted the phone number and has screenshots of the text messages.

115.    The intended plan was to use one of the plaintiff's familiars in the United States to encourage the plaintiff to fly her from East Africa to the United States, triggering charges, which would correspond with the bogus profile the defendants had created for the plaintiff at home, abroad and online.[56]

### Extremist-themed Entrapment Operations

116.    The plaintiff asserts that for more than a decade the defendants have targeted him with what equate to patsy-fishing expeditions.

117.    In Fall 2013, within a month of the plaintiff's return to the United States, the defendants ran several entrapment operations targeting the plaintiff as he prepared for his comprehensive exams.

118.    The principal focus of the defendants was to entice the plaintiff to join some type of Muslim organization or organizations.[57]

119.    Subsequent to the plaintiff's move to North Virginia in September 2015, he has been approached by Muslim[58] informants who have actively attempted to engage him.

---

[56] The plan fell through after the FBI discovered the plaintiff knew her original national identification number and personal information. The plaintiff informed personnel within the government of that country that document falsification had occurred or was in the process of occurring.

[57] This also occurred more than five times on the plaintiff's university campus. During the same timeframe, on three occasions the plaintiff was followed on campus by an unknown individual of apparent Middle Eastern descent, wearing a full-length beard, Muslim dress and skullcap. This person went out of his way to engage the plaintiff in conversation several times. The plaintiff refused to respond in each instance.

[58] The plaintiff uses the descriptor "Muslim" versus Arab, because the defendants have utilized a lot of non-Arab Muslims, such as Afghanis and Somalis, in their entrapment operations targeting the plaintiff.

120.   In the plaintiff's experience, at least some of the entrapment operations, which have targeted the plaintiff, are run immediately subsequent to violent extremist acts in other parts of the United States.

121.   In June 2016, several days after the deadly mass shooting in Florida, the plaintiff was approached by three individuals with full-length beards and ankle-length Arab clothing who attempted to engage the plaintiff in conversation twice, with comportment unusual enough to call the attention of other people in the immediate vicinity.[59]

122.   The plaintiff is under the impression that the FBI has been prepared to parade his bogus profile and trumped up South American court case the moment it was successful in getting the plaintiff caught up in one of its entrapment operations.

### Impact on Profession and Career

123.   The NSA is running surveillance operations from US facilities[60] based abroad and and in some instances used those locations to intercept the plaintiff's phone conversations and internet communications

124.   The intercepted communications were then used for the purpose of targeting, disrupting and sabotaging the plaintiff's finances and activities, including but not limited to the interference with two NGO start-ups in Africa.

---

[59] Given the location at which this incident occurred, the ethnic composition of the neighborhood, the religious dress of the individuals, and several other factors, their attempt at interaction with the plaintiff was very unusual and suspicious. As a matter of habit, the plaintiff refuses to speak with informants and attempts to remove himself from the vicinity of such operations as quickly as possible.

[60] Plaintiff can provide details and addresses of these facilities, if required.

125.    The NSA made the plaintiff's communications available to FBI personnel operating in the same countries in which the plaintiff resided in Africa. That information was in turn was distributed to InfraGard personnel, contractors, foreign governments, their security apparatus and civilians.

126.    The plaintiff had intended to run an NGO in Africa, in tandem with a second company specializing in regional security analysis and had the governmental connections at the time to do both.[61]

127.    In both cases, once the FBI learned that the plaintiff was trying to mount projects in East Africa, they made contact with the plaintiff's local connections, both governmental and private, and sabotaged his endeavors.

128.    As a result of the defendants' activities, the plaintiff is now concerned about returning to the region and is worried his personal safety is now in jeopardy as a result of the defendants' gross proliferation of disinformation,

129.    The false accusations levelled against the plaintiff by the defendants are geared to trigger proxy detention or to incite violence against the plaintiff in parts of the world with poor human rights records.

130.    In June of 2016, in Falls Church, Virginia, the plaintiff was introduced to a Ph.D. from the Horn of Africa, whose expertise in part coincided with that of the plaintiff.

---

[61] On July 8, 2013, the plaintiff set up an NGO called the African Cryopreservation Project Inc. (Florida Corporation N13000006138) while living in East Africa. Plaintiff had the goal of creating a cryopreservation facility to catalog and store tissue samples from poached and endangered species.

131.   The plaintiff and the Ph.D. subsequently arranged to meet on July 9, 2016 in order to discuss writing a book or starting a think tank. Prior to the meeting, the defendants contacted the African scholar, told him the plaintiff was being "monitored" and intimidated or coerced him into not meeting with the plaintiff.

132.   As previously mentioned, the plaintiff has also had his research stolen by the defendants and relayed, at least in part, to a foreign government.

133.   As of the date of the filing of this request for relief, the defendants are still aggressively attempting to deny the plaintiff the ability to generate an income or advance professionally.

134.   In addition to hacking the plaintiff's eBay and PayPal accounts, the defendants have interfered with the plaintiff's sales on eBay and contacted suppliers for a new business opportunity the plaintiff was considering.

135.   The suppliers were coerced by the defendants not to do business with the plaintiff. This has happened on several occasions.

136.   It also appears that the defendants contacted one of the plaintiff's potential employers, and stated the plaintiff was "under investigation," which resulted in the plaintiff being passed over for a lucrative employment opportunity in his area of expertise.

## Interference with Legal Counsel

137.    Through the real-time monitoring of the plaintiff's e-mails, online activity and phone conversations; the defendants have denied the plaintiff his right to legal counsel.

138.    These activities began with the plaintiff's proxy detention in 2004 while the plaintiff lived abroad and continue to this date.

139.    The defendants have demonstrated a pattern of initiating legal problems for the plaintiff and then utilizing privacy-invading technology to prevent the plaintiff from acquiring legal counsel.

140.    In the plaintiff's case, the defendants and particularly FBI personnel have shown a pattern of interfering with legal processes in cases they themselves created or initiated in order to target the plaintiff.

141.    These acts have occurred in the United States, South America, and three East African countries.

142.    During the first two weeks of January 2015, the plaintiff visited and perused the website of an attorney in South Florida. The following day the plaintiff called the attorney, who indicated to the plaintiff that he had already been contacted by the FBI in advance of the plaintiff's call and warned against representing the plaintiff.[62]

---

[62] The attorney relayed the FBI had stated the plaintiff was a "parolee, convicted for rape and multiple crimes of moral turpitude," and to "limit his interaction" with the plaintiff. When the plaintiff responded that he was not a parolee, and had never been arrested, let alone convicted for rape or crimes of moral turpitude, the attorney replied "If what you are telling me is true, then the FBI is really pushing the f***ing envelope these days; I've never seen anything like it."

143.    On January 19, 2015, the plaintiff met with an attorney[63] who agreed to (1) contact the FBI on the plaintiff's behalf, (2) help the plaintiff remove the bogus social networking accounts set up in his name on the internet, and (3) procure what he referred to as a "letter of absolution" for the plaintiff.

144.    In February 2015, the plaintiff arrived early at the attorney's office for a meeting. The plaintiff overheard the attorney, who was unaware the plaintiff had entered the office; give a detailed account of the plaintiff's case to an unknown third party over the office phone.[64]

145.    The information relayed to the third party over the phone by the attorney revealed the attorney was privy to accusations leveled against the plaintiff, of which he, the plaintiff, was unaware.

146.    The attorney stated in that conversation that the plaintiff's sister and father had "spoken with law enforcement at length." However, the plaintiff had no knowledge of the accusations prior to overhearing the attorney's conversation.[65]

147.    The plaintiff did not give the attorney any indication that he had heard the conversation, and let the attorney continue on the premise that he (the plaintiff) assumed the attorney was representing his best interests.

---

[63] "W.R." of Coral Gables, Florida.

[64] The only thing separating the plaintiff from the attorney was a frosted, sliding glass partition between the receptionist's office and the waiting room, so the conversation was both audible and entirely comprehensible.

[65] The plaintiff has had little to no contact with his sister or father for more than a decade and neither of them have any information regarding the plaintiff's activities to the best of the plaintiff's knowledge.

148.    The attorney subsequently refused to assist the plaintiff in clearing his name, kept the cash retainer[66] he had demanded of the plaintiff, told the plaintiff that a letter of absolution from the FBI was not necessary, nor was the need for him to contact the FBI on behalf of the plaintiff.

149.    The attorney stated to the plaintiff he should "not pursue any more FOIA or Privacy Act (PA) Requests"[67] and to "stop filing complaints with the DOJ, FBI and DHS."

150.    The attorney also noted to the plaintiff that the plaintiff had "studied some pretty unusual topics," and that maybe it was "time for the plaintiff to change his academic focus."[68]

## Interference with Legal Counsel - South America

151.    As of 2014, the court case resulting from the plaintiff's illegal proxy detention in South America was still ongoing.[69]

152.    In October 2014, in an effort to resolve the open case, the plaintiff called an attorney who had previously helped him.

153.    The attorney stated to the plaintiff that his arrest and detention were illegal, that no one had been injured; the "witnesses" had never appeared to give

---

[66] $5000.00.

[67] Plaintiff had informed the attorney that he was in the process of filing FOIA and PA Requests with the defendant agencies.

[68] Implying that the attorney - with his inside information, thought the plaintiff's academic focus had played a central role in his current situation.

[69] As of December 2016, the case is still moving forward, albeit with heavily falsified court documents resulting from FBI interference and tampering.

testimony and that after more than a decade, the case could effectively be terminated through a motion to dismiss.

154.    Subsequently, the FBI - in conjunction with foreign security apparatus personnel, approached the plaintiff's attorney, as well as effecting the modification of the plaintiff's court documents and process.

155.    Within 24 hours of the plaintiff's conversation with his attorney, more than a decade after the incident, the charges were were suddenly changed to reflect that the plaintiff was on trial for homicide, despite the fact that no one had been injured.[70]

156.    On the same day, the court sent out summons for the "witnesses"[71] who had not been heard from for more than a decade.

157.    The plaintiff's attorney, originally upbeat and positive about the plaintiff's case, dropped the case the same day the court documents were modified, while several days later a different attorney told the plaintiff that she had been advised, "not to help the plaintiff recuperate his land and home in that country."

158.    The defendants intercepted the plaintiff's South Florida to South American communications and utilized those interceptions to eliminate all of his legal support.

---

[70] The plaintiff's security guard discharged a gun into the air in a rural farming community and the plaintiff was detained along with the security guard.

[71] It should be noted that none of the "witnesses" were at the location where the plaintiff's employee discharged his gun and that all of these "witnesses" have extensive criminal backgrounds.

159.    In 2016 the "witnesses" reappeared and were coached to give testimony against the plaintiff, which "compliments" the bogus profile created and recirculated in Africa by the FBI.

## Tortious Interference

160.    The defendants have utilized data interception of the plaintiff's telephonic and online communications in order to sabotage his finances and facilitate personal property loss.

161.    In late 2013 or early 2014, the defendants contacted the person[72] assisting the plaintiff with the security of his personal effects[73] in East Africa while the plaintiff was in the United States.

162.    Defendants told the plaintiff's East African contact that the plaintiff was involved in criminal activity[74] in the US and in Africa and sought his cooperation in targeting the plaintiff.

163.    The contact, whom the plaintiff at this point considered a trusted friend, then began to assist the FBI in attempting to convince the plaintiff to fly his

---

[72] "G.K." of Davie, Florida stated he was licensed to practice law in an East African country, and misrepresented himself to the plaintiff as an attorney licensed to practice in Florida when the plaintiff first spoke with him on the phone from East Africa.

[73] The plaintiff had appliances, electronics, research material, clothing, equipment and collectibles, which he had acquired over the four years he was in the region. Estimated value $50,000. Due to all of the issues he was experiencing with the defendants, in 2014 the plaintiff decided to have his personal property shipped back to the United States instead of returning to East Africa. "G.K." agreed to coordinate the shipping and entered into an agreement with the plaintiff.

[74] Defendants accused the plaintiff of crimes of moral turpitude involving minors in the United States and Africa.

ex-girlfriend in from East Africa, in the entrapment operation referenced in paragraph 114 of this petition.

164.    When this failed, the plaintiff's contact - responsible for the storage and shipping of the plaintiff's property, began to use abusive and racially-charged language with the plaintiff, threatened the plaintiff with harm should he return to East Africa,[75] and then severed all contact with the plaintiff.

165.    The plaintiff lost all of his personal property as a result of the FBI's disinformation and interference.

166.    When the plaintiff tried to retain an attorney in East Africa to get his property back, the FBI utilized that communication as another opportunity to attempt to entrap the plaintiff.[76]

167.    When the defendants learned the plaintiff moved his art collection from South Florida to his mother's house in New York in early 2013, they utilized the plaintiff's family members to notify the plaintiff's mother that the plaintiff was involved in crimes of moral turpitude.[77]

---

[75] These statements were made in conjunction with inflammatory references to private aspects of the plaintiff's life and his ethnic heritage, information to which the plaintiff's contact "G.K." had never been privy. This information included where the plaintiff's family lived, where the plaintiff was born, his personal information and details regarding the plaintiff's recent family issues (caused by the defendants no less).

[76] One day after the plaintiff's initial contact with that attorney, the attorney stated to the plaintiff he had decided that it would be "difficult to recover the plaintiff's property." However, for a fee, the person in possession of the plaintiff's property ("G.K.'s" childhood friend) "could be taken care of," implying what the plaintiff interpreted to be bodily harm or death. The plaintiff immediately severed contact with the attorney, yet the attorney continued to send e-mails to the plaintiff demanding he send money to "take care" of the plaintiff's "problem."

[77] The defendants used of two of the plaintiff's family members as vehicles for carrying the disinformation and false profile they had created for the plaintiff, to the plaintiff's mother, with the goal of severing plaintiff's family ties, and triggering property and inheritance loss.

168.   As a result, the plaintiff's mother severed all contact with the plaintiff, and passed legal administration of the plaintiff's personal possessions, a valuable art and antique collection, and family heirlooms belonging to the plaintiff, to a "family" attorney.[78]

169.   The attorney then began making defamatory and deprecatory statements about the plaintiff to his mother in e-mails, based entirely on the false profile created for the plaintiff, by the FBI.

170.   Thus, the plaintiff has substantial reason to believe the defendants approached attorney "J.L." at the same time that defendants were interacting with other family members in order to influence the plaintiff's mother, to further estrange the plaintiff from his family members, and to trigger the loss of all of the plaintiff's personal possessions.

171.   In May 2016, the plaintiff filed a formal complaint with the New York State Bar Association against the attorney for conflict of interest and undue influence.[79]

172.   Disposition of the plaintiff's personal items is still being determined at this point in time.

---

[78] At the time, attorney "J.L." of Vestal, N.Y. was managing the finances of the plaintiff's infirm grandmother, in conjunction with the plantiff's mother.

[79] As of December 9, 2016, the attorney "J.L." was still under investigation by the New York State Bar Association Grievance Committee for undue influence and other questionable activities.

## Post-Grievance Harassment

173.   Subsequent to the plaintiff's July 2016 complaints regarding harassment, stalking and civil rights violations to the State of Virginia, Office of the Secretary of Public Safety,[80] and DHS Office for Civil Rights and Civil Liberties (CRCL),[81] the plaintiff was subject to what can only be characterized as a regime of increasingly brazen assaults, death threats, stalking and vandalism.

174.   The plaintiff has been followed through different public locations, on different days, in Fairfax County, Virginia, by permanent resident aliens and foreign nationals, some of whom have been armed and several of whom were later identified as parolees and criminals.

175.   In August and September of 2016, the plaintiff was stalked in different commercial locations in Falls Church, Virginia by two individuals who identified themselves to the plaintiff as being of Somali descent.

176.   One of these individuals stated he worked for the Department of Justice (DOJ), and the plaintiff subsequently learned the second person had just been released from prison on what some said was an early parole.[82]

---

[80] On July 6, 2016, the plaintiff e-mailed a complaint and cease and desist order directly to the Virginia Secretary of Public Safety and Homeland Security, Brian Moran, and sent copies of the communiqué to the Virginia Office of the State Inspector General (OSIG), the Office of the Governor of Virginia, DHS CRCL, and DOJ, Office of the Inspector General.

[81] On July 11, 2016, the plaintiff submitted another complaint to DHS CRCL stating that subsequent to his July 6, 2016 communications to DHS CRCL, and Virginia Public Safety Secretary Brian Moran, the constitutional rights violations and harassment had actually increased. The plaintiff also advised the Office of the Secretary of Public Safety that a continuation of such activities would result in legal action.

[82] These two individuals approached the plaintiff and aggressively engaged the plaintiff in conversation using his personal and confidential information. They also tried to engage the plaintiff

177.    On July 9, 2016, as the plaintiff entered a business in Falls Church, Virginia, he was aggressively confronted by an unknown individual who stated to the plaintiff, "you are lucky to be alive. You better shut your mouth or you are a f***ing dead man."[83]

178.    Within several hours of being accosted in Falls Church, the plaintiff's residence was broken into and ransacked while he was away from his apartment.[84]

179.    Several days later, the plaintiff was approached by an employee at a local supermarket who told the plaintiff that she had just "seen a movie the plaintiff would 'really like' about a guy who was killed for reporting government corruption."[85]

180.    Within several days of this incident, a very large, brutally mangled rat was placed in front of the entrance to the plaintiff's residence.

181.    On July 14, 2016, while meeting friends for coffee in Falls Church, Virginia, the plaintiff's locked vehicle was accessed, ransacked and left with the doors open.

---

in conversation in the Somali language. The plaintiff, who is not familiar with the language, had never had any prior visual or verbal contact with either individual.

[83] Plaintiff subsequently discovered that the would-be assailant was a homeless person with a criminal record, who lives on the street near the business where the plaintiff was accosted. The plaintiff believes this action to be a breach of 18 U.S. Code § 1512, tampering with a witness, in addition to substantiating the plaintiff's claim that the defendants have conspired to interfere with the his civil rights (42 U.S. Code § 1985), since the defendants have involved and employed multiple actors for their stalking and disruption operations.

[84] The break-in was reported to DHS CRCL, July 11, 2016.

[85] The supermarket employee was referencing the 2014 movie entitled *Kill the Messenger* in which the protagonist in the film was allegedly killed for reporting and publicizing corruption of a government agency. Plaintiff maintains that this constitutes a breach of both 18 U.S. Code § 1512 and 42 U.S. Code § 1985, as referenced in Footnote 83.

182.    As the plaintiff drove back to his residence that evening, he noticed mechanical difficulties with his vehicle. The following day, the plaintiff put the vehicle through a diagnostic test and physical inspection, which revealed that a hole had been chiseled through the engine-mounted air intake.[86]

183.    In March 2016, the plaintiff was stalked through a store in Springfield, Virginia by an individual displaying aggressive body language towards the plaintiff, while openly carrying a semi-automatic handgun.

184.    During the second half of July and August, the plaintiff was threatened in several different commercial locations in Falls Church in Virginia.

185.    On one occasion, the plaintiff was approached by an individual who lifted up his shirt to display an empty holster on his belt, as he relayed to the plaintiff in a threatening manner that he had a "gun in his vehicle[87] and he wasn't afraid to use it on the right person."

186.    A second person then approached the plaintiff and told him "Terrorists didn't belong in his African country, or here in the United States."

187.    During the second half of August, in North Virginia, the plaintiff was told by an African store employee, who knew the plaintiff had lived in Africa, that since the plaintiff was a "Muslim" and a "homosexual," the plaintiff would no longer

---

[86] This activity necessitated access to the inside of the plaintiff's vehicle so that the hood release could be manually activated. An insurance claim was filed by the plaintiff with his insurance company. Since the plaintiff has a $500 deductible, he paid for the repair and diagnostic out of pocket.

[87] The vehicle was parked within twenty feet of the person assaulting the plaintiff.

be welcome in his predominantly Christian, African country, and should instead "go back to Afghanistan or Somalia," to be with his "Muslim friends."

### FBI's Interaction with Plaintiff's Contacts in Africa

188.    The plaintiff speaks four Sub-Saharan languages and has a good understanding of African Geopolitics, thus while living in East Africa he integrated very quickly with the diplomatic community.

189.    The plaintiff's conversations and communications with his diplomatic contacts, which included African Union Ambassadors, were intercepted by several of the NSA's foreign monitoring stations, which in turn relayed to the FBI.

190.    FBI personnel then contacted many of the people within the plaintiff's diplomatic network including ambassadors and embassy staff of foreign embassies, with whom the plaintiff was friendly.

191.    In some cases, the plaintiff's contacts were hooked with the FBI's "he is being vetted for a job with the US government" narrative, but balked once FBI personnel attempted to get them to engage in criminal acts against the plaintiff.

192.    On two occasions, the plaintiff has actually been accused of working for the FBI in some type of entrapment operation.[88]

193.    In 2010, one of the plaintiff's contacts stated he was called in Europe, by American personnel working out of a US government facility[89] located in the same African country in which the plaintiff lived at the time.

---

[88] The plaintiff has never engaged in such activity.

[89] Plaintiff can provide details and address of said facility if required.

194.    The contact stated to the plaintiff that he was phoned by the FBI, was encouraged to engage in some type of criminal acts against the plaintiff, and thus assumed the plaintiff was working in conjunction with the FBI in an attempt to entrap him. The plaintiff's contact stated he in turn had called his country's security apparatus and availed them of the incident.[90]

195.    The plaintiff immediately advised the U.S. embassy of the incident.

**Freedom of Information and Privacy Act Requests**

196. The plaintiff sent Freedom of Information Act (FOIA) and Privacy Act Requests to the FBI, DHS, and NSA, all of which were denied or met with a Glomar response. The plaintiff has initiated a FOIA/PA lawsuit against the FBI in the U.S. District Court, Eastern District of Virginia (1:16-cv-01400-JCC-JFA) in order to review his records, and amend them as provided for under 5 U.S.C. § 552a(d)(2).

197.    In July 2015, the plaintiff submitted a records request to the Miami Dade Police Department (MDPD).

198.    The plaintiff requested information seeking information regarding the placement of tracking devices on his vehicle and the interception of his cell phone communications through cell-site simulator technology.

199.    Despite being required by the State of Florida to respond to the request within thirty days, the MDPD ignored the initial request and all of the plaintiff's follow up communications. In early 2016, six months after the initial request, the

---

[90] In 2014, another individual made the same claim to the plaintiff in the US. He believed the plaintiff was "working with the FBI" in order to get him (the plaintiff's contact) to engage in criminal activity for the purpose of entrapment.

MDPD sent their response to the plaintiff's records request under Florida's "Sunshine Law" records request.

200.    The response did not contain any of the information the plaintiff requested in his July 2015 letter to the MDPD, nor any reference to that request. Rather the packet contained several editions of *The FBI News Briefing*,[91] which referenced the arrests of individuals for pedophilia and terrorism.[92]

201.    While the FBI was never copied in the original records request to MDPD, the FBI appeared to have handled MDPD's response to the plaintiff.

### Communications and Complaints

202.    The plaintiff has made numerous efforts to contact the defendant agencies *and* their respective directors, in an attempt to address the ongoing issues and to avail them of the fact that the plaintiff was and still continues to be the subject of constitutional rights violations and harassment.

203.    In addition to filing complaints with FDLE, FBI, NSA Office of the Inspector General, DHS, DHS CRCL, the plaintiff also also filed complaints and requests for investigations via USPS certified mail with the following individuals:

    A. Director James R. Clapper - Office of the Director of National
       Intelligence[93]

---

[91] "Prepared for the Federal Bureau of Investigation ... Director and the Senior Staff." *The FBI News Briefing* header.

[92] The paperwork sent to the plaintiff also contained a crude reference to the human rights violations the plaintiff suffered during his time in solitary confinement during the 2004 proxy detention. In addition to interfering with the plaintiff's rights under Florida law to access his records, the FBI-assembled parcel of printed information was nothing more than an attempt to harass the plaintiff and induce emotional distress.

[93] The plaintiff communicated directly with the Office of the Director of National Intelligence (DNI), by e-mail with Ms. Stephanie Sherline, Executive Assistant to the DNI, and by USPS Certified Mail,

B. Director James B. Comey - Federal Bureau of Investigation

C. Director Jeh C. Johnson - Department of Homeland Security,

D. Commissioner Richard Swearingen - Florida Department of Law Enforcement

E. Chief Harbaugh - Federal Bureau of Investigation - Internal Investigations

F. Secretary Brian Moran - Secretary of Public Safety - Commonwealth of Virginia

G. Miami Dade County Police Department[94]

## Conclusive Comments and Miscellanies

204.   The FBI's utilization of the word "investigation" is misleading since by their own admission, their "investigations" are not solely comprised of surveillance and evidence collection, but also proactive disruption measures, as referenced throughout this petition.[95]

205.   The plaintiff maintains that according to military and law enforcement documents and publications, the extra-judicial disruption protocol the defendants have employed against him is comprised of counter-terrorism tactics, previously reserved only for designated "enemy combatants" in foreign countries.[96]

---

sent directly to the DNI's office. These communications and complaint submissions occurred between February and June 2016 and referenced repetitive constitutional rights violations, and outrageous government conduct of the defendant agencies listed within this request for relief. The Office of the DNI never responded to the plaintiff's communiqués.

[94] The plaintiff is able to provide copies of all of the communications, in addition to USPS Certified Mail reference numbers confirming their delivery to the offices of the afore-referenced parties.

[95] See Footnote 4.

[96] These operations are detailed at length in declassified US military documents, and open source, federal law enforcement publications.

206.   The defendants are using these counter-terrorism tactics against an innocent American citizen who was never afforded due process, for crimes he never committed, nor did he ever show a predisposition to commit.

207.   In addition to using private detectives and contractors, as previously referenced,[97] the defendants are also employing "Surveillance Role Players" to overtly monitor, stalk and interact with citizens they have labeled as "threats" and "terrorists."

208.   In 2014, the plaintiff went to the FBI's North Miami Field Office on two occasions, told the FBI personnel their "investigation" was destroying his life, and offered to take a polygraph.[98]

209.   The defendants have worked with a high level of complicity, over a long period of time and in diverse geographical locations, however in respect to the plaintiff's case, the FBI and DHS have been the primary orchestrators of the plaintiff's targeting and harassment.

210.   In the opinion of the plaintiff, the FBI has spent a considerable amount of time and effort creating, peddling and recirculating disinformation targeting him in at least six foreign countries and is now loathe to let such a highly developed, albeit false, criminal and terrorist profile "go to waste."

---

[97] Surveillance Role Players and their activities are referenced in Paragraph 15 of Attachment 5A. Open source documents and employment opportunities for surveillance role players (secret security clearance required), identify many of the private companies and defense contractors that provide the manpower to the defendants, for domestic, street-level, counter-terrorism operations.

[98] On both occasions, the FBI refused the plaintiff's offer to take a polygraph exam. Instead, immediately after the second visit, the FBI ran the entrapment operation described in Paragraph 99 against the plaintiff.

211.    The defendants have actively worked to disrupt the plaintiff's familial, social and professional networks. The false accusations leveled against the plaintiff by the defendants have been horrific in nature, and were designed to isolate the plaintiff from his family, peers, familiars and the community, while simultaneously subjecting him to emotional distress.

212.    Individuals and families who thought they knew the plaintiff were deterred from associating him with due to the seriousness and grotesque content of the disinformation relayed to them by the defendants.

213.    The plaintiff's links to the tightly knit, conservative Christian, East African community in the United States and Africa, were severed subsequent to the defendants' aggressive dissemination of disinformation targeting the plaintiff.

214.    The network of diplomatic and governmental contacts, which the plaintiff had so laboriously cultivated during the four years he spent in Africa, and which were vital to his career in the region, were also effectively neutralized as a result of the defendants actions.

215.    In the plaintiff's case, the defendants have utilized National Security Letters (NSLs), Non-disclosure Agreements, and FISA (Federal Intelligence Surveillance Act) Warrants as mechanisms of extra-judicial punishment versus investigatory tools.

216.    In the plaintiff's case, the defendants have also used NDAs to dupe recently arrived foreign nationals, permanent resident aliens, and American

citizens into committing constitutional rights violations and hate crimes under the guise of "national security."

217.    With respect to the plaintiff, the defendants are "winding up" malleable individuals[99] by using NDAs to convince them they are "working with the government," on "national security" matters, and then setting these individuals loose on the plaintiff,[100] after they have been pumped full of disinformation meant to incite anger and violence.[101]

218.    The plaintiff would like to point out that the defendants' actions do not serve the public interest in any way.

219.    The actions described within Paragraph 217 place the plaintiff and the community at risk.

220.    As referenced within this petition for relief, the defendants have habitually engaged in acts, which constitute civil rights violations, constitutional rights violations, and violations of the Universal Declaration of Human Rights.[102]

---

[99] It appears to the plaintiff that in his case, the defendants are relying on members of the immigrant community as their primary manpower resource, and in some instances have used immigration and legal assistance as forms of compensation for their cooperation.

[100] The defendants are also providing these dangerous civilian hirees with the plaintiff's location in real time. The plaintiff has observed the same individuals follow him through different public locations in different cities on different days, and has recorded the license plate numbers of several of the principal (repeat) perpetrators.

[101] In the plaintiff's case, the defendants have exploited the socio-economic, ethnic, racial and religious differences of the people the plaintiff comes into contact with, in order to exacerbate tensions and issues, which they (the defendants) initiated and cultivated.

[102] The plaintiff is referencing his "right to work under the Universal Declaration of Human Rights.

221.    The plaintiff would like to state for the record that what he has been subject to, under the direction of the defendants, has not occurred sporadically, but simultaneously, in clusters and on a daily basis.

222.    In order to attempt to instill a sense of fear and hopelessness in the plaintiff, and to convey the impression that he has no safe quarter, on-line threats, receipt of abusive spam with personal information, and disruption of accounts, in addition to stalking and harassment in public places, all frequently occur within the course of a single day.

223.    The failure of all of the defendant agencies, including their respective directors, to address the outrageous government conduct of their personnel, indicates deliberate indifference, while simultaneously demonstrating blatant disregard for the plaintiff's rights.

224.    As a final note, the plaintiff posits the defendants and the different entities that work in conjunction with them, have engaged in activities, which constitute violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act.